IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

DEWAYNE MATHEWS and DEBRA
TURNER, Individually and on behalf of all
others similarly situated,

    Plaintiffs,

vs.                                          Civil Action No.: 4:20-cv-00200-JFH-JFJ

PHH MORTGAGE CORPORATION,

    Defendant.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S AMENDED MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Plaintiffs DeWayne Matthews and Debra Turner (hereafter "Plaintiffs"), through their undersigned counsel, hereby serve their response in opposition to Defendant PHH Mortgage Corporation's (hereafter "PHH") Amended Motion to Dismiss Plaintiffs' Complaint. (Doc. 53).

**I. INTRODUCTION**

In March 2007, Plaintiffs executed a note and mortgage with GMAC Mortgage, LLC for the purchase of a home located in Claremore, Oklahoma. The note and mortgage were eventually assigned to Ocwen Loan Servicing, LLC ("Ocwen"). In the summer of 2019, Ocwen was merged into PHH and PHH became the successor in interest to and assumed the liabilities of Ocwen.[1]

Plaintiffs' loan was federally insured by the Federal Housing Administration (FHA) and was what is commonly referred to as an FHA loan. Loans insured by the FHA have many advantages to lenders and servicers, the greatest being that all FHA approved loans are insured against loss by the FHA. The insurance provided to lenders by the FHA protects lenders against

---

[1] For ease of reference, Plaintiffs' use of "PHH" refers to both PHH and its predecessor Ocwen.

losses resulting from a homeowner's default. Lenders bear far less risk because the FHA will pay a claim to the lender in the event of a homeowner's default. In exchange for this insurance, lenders agree to abide by certain federal regulations.

The loan documents governing Plaintiffs' loan required compliance with HUD regulations that were referenced throughout the note and mortgage. The note provided:

> **6. BORROWER'S FAILURE TO PAY**
> **(B) Default**
> If Borrower defaults by failing to pay in full any monthly payment, then Lender may, *except as limited by regulations of the Secretary* [HUD] *in the case of payment defaults,* require immediate payment in full of the principal balance remaining due and all accrued interest…. In many circumstances *regulations issued by the Secretary will limit Lender's rights to require immediate payment in full in the case of payment defaults.* This Note does not authorize acceleration when not permitted by HUD regulations. As used in this Note, "Secretary" means the Secretary of Housing and Urban Development or his or her designee.

(Doc. 1-2 at 19-20) (emphasis added). Not only does the note limit the lender's rights, but the mortgage includes specific limitations on the fees a lender is allowed to charge a homeowner. The mortgage states:

> **8. Fees.** Lender may collect fees *as authorized by the Secretary*.
>
> **9. Grounds for Acceleration of Debt.**
> **(a) Default.** Lender may, *except as limited by regulations issued by the Secretary* in the case of payment defaults require immediate payment in full of all sums secured by this Security Instrument…
>
> **(d) Regulations of HUD Secretary.** In many circumstances *regulations issued by the Secretary will limit Lender's rights*, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. *This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.*

(*Id.* at 25) (emphasis added).² These provisions subject the rights of the lender to the HUD

---

² The "Secretary" as used in the loan documents means the Secretary of Housing and Urban Development or HUD.

regulations.

HUD regulations specifically limit a lender's right to charge a homeowner fees for property inspections. A lender is permitted to charge a homeowner a property inspection fee only when the home is unoccupied. HUD regulation 24 C.F.R. § 203.377 states:

> The mortgagee, *upon learning that a property subject to a mortgage insured under this part is vacant or abandoned*, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, and *efforts to reach the mortgagor by telephone within that period have been unsuccessful,* the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant.

24 C.F.R. § 203.377 (emphasis added). In addition to the plain language of the regulation, HUD's Handbook provides clear guidance to lenders explaining that property inspection fees cannot be charged if the home is occupied:

> If there is evidence that the mortgagee knew the mortgagor was still in occupancy, such as documented communication with the mortgagor, counseling agency, the mortgagor's attorney or the local HUD office, *such charges are inappropriate and must not be charged to the mortgagor* or included on a claim for insurance benefits.

HUD Handbook 4330.1 REV-5 9-9(A)(c)(2)(d) (emphasis added).[3] Despite these prohibitions, from February 2016 through November 2018, PHH assessed property inspection fees against Plaintiffs fourteen times.

At all times relevant to this action, Plaintiffs occupied the home at issue in this case. Since the time Plaintiffs purchased their home, PHH exchanged numerous letters, telephone calls, and emails with Plaintiffs. When PHH filed a petition in the District Court of Rogers County, Oklahoma seeking to foreclose on Plaintiffs' mortgage (*see* Doc. 7-1), it even served the summons for the foreclosure case on Plaintiffs at the home. PHH never had any reason to believe the home

---

[3] PHH has asked the Court to take judicial notice of the Handbook. (Doc. 53 at 5, n.3) Plaintiffs also request that the Court take judicial notice of the Handbook.

was unoccupied. Despite unequivocally knowing Plaintiffs occupied the home, PHH continuously charged them property inspection fees. All in all, Ocwen charged Plaintiffs almost $300.00 in property inspection fees, even though it knew the house was occupied.

Fearful of losing their home, after Plaintiffs were served the foreclosure petition, they requested a pay-off from PHH. PHH provided a pay-off that included the property inspection fees. Notably, the payoff quote was mailed to Plaintiffs at the same address PHH charged them to inspect. *See Ex. 1, Payoff Letter Ocwen to Debra Jo Turner and Dewayne Mathews*.[4] Concerned about losing their home, Plaintiffs paid-off the mortgage—including the improper fees assessed by PHH—in full.

Having persistently disregarded its contractual obligations to comply with the HUD regulations incorporated into the mortgage contract, PHH now moves to dismiss Plaintiffs' complaint. The Court should deny Defendants' motion for the reasons set forth below.

## II. ARGUMENT

### A. Plaintiffs have alleged sufficient facts to show that PHH improperly charged them inspection fees.

The HUD property inspection fee regulation at issue in this case permits a lender to charge a property inspection fee only if it has reason to believe the home is unoccupied and efforts to reach the mortgagor by telephone have been unsuccessful. If the lender has no evidence the home is unoccupied, a property inspection fee is not authorized to be charged and is not reimbursable by

---

[4] Plaintiffs do not intend for PHH's motion to be converted to a motion for summary judgment by attaching the pay-off quote to this response. At the motion to dismiss stage, a court is permitted to consider documents referenced in the complaint without conversion having to convert the motion into a motion for summary judgment. Inclusion of a document integral to Plaintiffs' petition does not convert a motion to dismiss to a motion for summary judgment. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

HUD. In its motion, PHH—relying on HUD's Administration of Insured Home Mortgages Handbook (4330.1) (the "Handbook")—tries to characterize these allegations as a "misstatement" of HUD's requirements. But, in fact, a review of the Handbook's provisions confirms the veracity of the foregoing statements.

PHH correctly notes that HUD authorizes a servicer to collect fees for inspections after a borrower defaults and to be reimbursed for those fees under certain circumstances. HUD categorizes inspections as "initial, occupancy and vacant." Handbook § 9.9(A)(1). HUD regulations require both the initial and vacant inspections. *Id.* An initial inspection is authorized "[w]hen the mortgage is in default and a payment is not received within 45 days of the due date and efforts to reach the mortgagor or occupant at least by telephone have been unsuccessful." *Id.* § 9.9(A)(1)(a). Under those circumstances, the servicer "must perform a visual inspection of the mortgaged property to determine if it has become vacant or abandoned." *Id.* HUD permits only one initial inspection during a period of delinquency. *Id.* § 9.9(A)(1)(a)(1).

An occupancy inspection "is an additional servicing tool available to a mortgagee to assist in establishing if a property subject to a mortgage in default has become vacant or abandoned." *Id.* §9.9(A)(1)(b). HUD provides that the occupancy inspection is permitted "[i]f the mortgage remains in default after the initial inspection and the mortgagee is unable to determine the occupancy status by telephone[,] a correspondence on inspection and adequate follow-up must be made within 30 days of the last inspection or follow-up." *Id.* § 9.9(A)(1)(b)(1). The servicer may continue to perform occupancy inspections "[w]hen the conditions necessitating the occupancy inspection continue [and] within the previous 30 days there have been no payments, *no contact with the defaulting mortgagor <u>and</u> increased probability of potential abandonment*." *Id.* § 9.9(A)(1)(b)(2) (emphasis added). The Handbook notes that servicers are permitted to

5

communicate with the HUD Office and/or counseling agency to determine the mortgagor's status. "For this reason, there should be few cases where an occupancy inspection is warranted and reimbursable while the assignment is being reviewed." *Id.* § 9.9(A)(1)(b)(6). Notably, the Handbook states:

> Inspections are not the only mechanism by which a mortgagee may establish occupancy of a delinquent mortgagor. *During the duration of any continuing delinquency, mortgagees must continue to prudently service the mortgage including regular attempts to contact the delinquent mortgagor by telephone and by written correspondence.* No delinquency should be allowed to continue indefinitely without some type of contact with the mortgagor.

*Id.* § 9.9(A)(1)(b)(7) (emphasis added). Moreover:

> *If there is evidence that the mortgagee knew the mortgagor was still in occupancy, such as documented communication with the mortgagor*, counseling agency, the mortgagor's attorney or the local HUD Office, *such charges are inappropriate and must not be charged to the mortgagor or included on a claim for insurance benefits*.

*Id.* § 9.9(A)(2)(d) (emphasis added).

Importantly, a servicer's inability to charge and recover inspection fees for an occupied property is reinforced—and made patently express—in HUD's Mortgagee Letter 81-26, which was "intended to clarify the Department's policy on the . . . issue" of property inspection fees and states, in relevant part:

> It is HUD's intent to permit mortgagees to be reimbursed for the cost of any mandatory inspection which is performed. This includes any inspection made after the mortgagee learns that the property is vacant or abandoned, or after it has been unable to contact the mortgagor by telephone during the initial 45-day period of a delinquency. Reimbursement for the latter inspection is allowed regardless of whether the property is found to be vacant or occupied, and regardless of whether the mortgagee's representative also talks to the mortgagor about the delinquency during the course of the inspection. *Once the property has been found to be*

6

> *occupied, however, no further inspections are required by HUD and reimbursement would not be allowed.*[5]

The Handbook reiterates multiple times that attempts to contact the mortgagor must be documented and that a servicer cannot obtain reimbursement for occupancy inspections without such documentation:

> HUD will reimburse mortgagees for occupancy inspections which were performed in accordance with the requirements of this Handbook *and are adequately documented including the valid follow-up attempt to confirm occupancy*.

*Id.* § 9.9(A)(2)(b) (emphasis added).

> The cost of inspections on occupied properties may be reimbursed *only* if the mortgagee has documented the attempted written or telephone contacts. *There must be adequate documentation to demonstrate that the mortgagor or occupant could not be contacted by any other means.*

*Id.* § 9.9(A)(2)(d) (emphasis added).

Thus, contrary to PHH's argument, it is indeed the case that (1) HUD permits a lender to charge a property inspection fee only if it has reason to believe the home is unoccupied and efforts to reach the mortgagor by telephone have been unsuccessful, and (2) if the lender has no evidence the home is unoccupied, a property inspection fee is not authorized to be charged and is not reimbursable by HUD.

Plaintiffs sufficiently allege in the Complaint that PHH knew their home was occupied and therefore was not authorized to charge them for fourteen separate inspection fees. Specifically, they allege that between February 2016 and November 2018, PHH assessed fourteen separate

---

[5] HUD Mortgagee Letter 81-26 (June 16, 1981), located at https://www.hud.gov/sites/documents/81-26ML.TXT (last visited July 1, 2020). HUD Letters are included on HUD's website under "Policies and Regulations," and the Court may take judicial notice of the Letters on the same basis as the Handbook. *See* Defendant's Motion at 5, n. 3.

property inspection fees against Plaintiffs. (Doc. 1-2, ¶ 19) Plaintiffs allege that they lived in their home during that entire period and PHH had no reason to suspect that the home was unoccupied and inspections were necessary. (*Id.* at ¶ 20) Indeed, while PHH was charging those impermissible inspection fees, it was in constant contact with Plaintiffs and knew they were still residing in the home. (*Id.*) To this point, Plaintiffs allege that PHH: mailed multiple items to their home via certified mail that were accepted by Plaintiffs; mailed all billing statements to Plaintiffs at their home; and mailed multiple items of First-Class mail with tracking numbers that were accepted by Plaintiffs at their home. (*Id.* at ¶ 17) Most notably, when PHH foreclosed on Plaintiffs' home, it mailed the Petition and Summons in the foreclosure case to Plaintiffs at the very property for which it was charging the property inspection fees. After receiving the foreclosure petition, Plaintiffs mailed a letter informing PHH of their intent to pay off the mortgage in full. *See* Exhibit 1. The letter references several phone calls between PHH and the homeowners. PHH's letter in response to Plaintiffs was addressed to the home PHH was charging for inspections. As demonstrated by these allegations, PHH had no reason to believe the home was unoccupied and did not conduct itself as if it knew Plaintiffs were not residing there. Accordingly, the property inspection fees were unwarranted pursuant to HUD regulations.

PHH argues that these allegations are somehow "vague" because Plaintiffs have not identified any "specific communications" between them and PHH and failed "to provide any detail about the communications." (Doc. 7 at 7) However, Plaintiffs' allegations, which do not aver fraud, are not subject to a heightened pleading standard. "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). "*Specific facts are not necessary*; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"

8

*Id.* (citation omitted). This standard does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs have met this standard. The allegations in the complaint are not vague and rise above a speculative level. They give PHH fair notice of exactly the harm Plaintiffs allege as well as an opportunity to present a defense to those claims. Moreover, all of the facts regarding PHH's contact with Plaintiffs are in PHH's possession, particularly in light of the Handbook provisions requiring the servicer to document its attempts to contact the mortgagor. *See* Handbook §§ 9.9(A)(1)(b)(4), 9.9(C)(3).

PHH cites several cases in which courts in purportedly "analogous circumstances" found "similarly vague" allegations to be insufficient to state a claim. But a review of these cases shows they, in fact, are not analogous to this case. For instance, in *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231 (10th Cir. 2013), the plaintiff filed an action against her lender's nominee, successor trustee, and fifty unnamed individuals. The complaint asserted violations of the Fair Debt Collection Practices Act (FDCPA), Utah statutory law, and related claims arising out of the foreclosure of her home. The court dismissed her allegations for being "too conclusory, vague and confusing to give each defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* at 1240 (internal quotation marks omitted). The court did not dismiss her claims—as PHH suggests—because she alleged "emails, faxes, correspondence, and/or meetings, and the like" without providing concrete details or examples. *Id.* Her claims were dismissed because "[f]rom such broad allegations against a large and mostly anonymous group of people," the court could not determine which defendant was alleged to be liable for the misconduct alleged. It was thus necessary for plaintiff to provide enough specificity about which defendant was responsible for each correspondence so the court could determine "which defendant is alleged to have done

9

what." *Id.* There is no such issue here, where PHH is the only defendant and all the correspondence was attributable to only PHH.

The *Burnett* court contrasted that case with *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d 1211 (11th Cir. 2012), in which the court held that borrowers stated a claim by attaching to their complaint a letter from the defendant. But in that case, the plaintiffs asserted a claim under the FDCPA, alleging that the defendant engaged in false, deceptive, or misleading representation behavior in connection with the collection of a debt. Accordingly, review of the letter was critical in determining whether the letter and enclosures were an attempt to collect a "debt" within the meaning of the FDCPA, thus stating a claim under that statute. *Id.* at 1216-17. Finally, in *Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012), the court rejected plaintiff's general assertions of religious discrimination and retaliation because she failed to provide any details whatsoever of the events leading up to her termination. The court noted that even though "[s]pecific facts are not necessary," she should have at least been able to allege facts such as when she requested FMLA leave and for what purpose, who she requested leave from and who denied her, and details about how Defendant treated her compared to other non-Arabic or non-Muslim employees. *Id.* at 1193-94. These cases, each decided based on the particular facts and claims presented, are in no way "analogous" to this case and do not stand for a general proposition that a plaintiff must always detail the correspondence received from a defendant.

Plaintiffs have sufficiently alleged that PHH improperly charged them inspection fees when PHH was in regular contact with them and had reason to know their residence was occupied. These allegations are sufficient to put PHH on notice of Plaintiffs' claims and it was not necessary for Plaintiffs to identify any specific communications between them and PHH or provide specific detail about those communications, all of which can be found in PHH's own records. Accepting

all factual allegations in the complaint as true and construing them in the light most favorable to Plaintiffs, as the Court must at this stage, *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017), it is clear that Plaintiffs have stated facts sufficient to allege that PHH breached the terms of the mortgage by improperly charging Plaintiffs inspection fees.

### B. Plaintiffs have properly stated a claim for violation of FDUTPA.

In addition to their breach of contract claim, Plaintiffs also assert a claim against PHH for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat, § 501.201 *et seq.* ("FDUTPA"). "The Florida legislature enacted FDUTPA in 1973 to protect consumers against commercial wrongdoing and it is patterned after the Federal Trade Commission Act (FTC Act), 15 U.S.C. §§ 45 *et seq.*" *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1260 (Fla. 3d DCA 2000) (citation omitted). FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The stated purpose of the act is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* § 501.202(2). As explained by the Florida Supreme Court, "[a] claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773 (Fla. 2003). Thus, a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *See Chicken Unlimited, Inc. v. Bockover*, 374 So. 2d 96, 97 (Fla. 2d DCA 1979).

11

Defendants seek dismissal of Plaintiffs' FDUTPA claim on several grounds, all of which are without merit.

### 1. FDUTPA is applicable to Plaintiffs' claims.

PHH first argues that FDUTPA does not apply to Plaintiffs' claims because this case is governed by Oklahoma law. PHH bases this contention on a choice of law provision in the mortgage stating the contract "shall be governed by Federal Law and the law of the jurisdiction in which the Property is located," in this case, Oklahoma. (Doc. 1-2 at 26). PHH argues that this provision requires that the contract and all claims based on an alleged breach of the contract be governed by Oklahoma law. This contention is misguided because the choice of law provision in the mortgage does not control Plaintiffs' FDUTPA claim.

It is well established under both Florida and Oklahoma law that claims arising in tort are not ordinarily controlled by a contractual choice of law provision. "Instead, the choice of law issue is decided according to the law of the forum state." *You Fit, Inc. v. Core Indus., Inc.*, 2012 WL 12952734, at *4 (M.D. Fla. June 22, 2012); *Bernal v. Charter Cty. Mut. Ins. Co.*, 209 P.3d 309, 315 (Okla. 2009) (recognizing that Oklahoma "applies different choice-of-law rules to actions that sound in tort from those that sound in contract"). "It is well established that claims under Florida's Deceptive and Unfair Trade Practices Act . . . are grounded in tort." *Eli Research, LLC v. Must Have Info Inc.*, 2014 WL 4540110, at *7 (M.D. Fla. Sept. 11, 2014); *Crowley Liner Servs., Inc. v. Transtainer Corp.*, 2007 WL 433352. at *5 (S.D. Fla. Feb. 6, 2007) (FDUTPA claims, although statutory in nature, have been held to sound in tort); *Am. Boxing & Athletic Ass'n, Inc. v. Young*, 911 So. 2d 862, 865 (Fla. 2d DCA 2005) (characterizing FDUTPA claim as a tort claim).[6]

---

[6] For this reason, the cases PHH cites in support of its argument that the choice of law provision precludes the FDUTPA claim—*Arndt v. Twenty-One Eighty-five, LLC*, 2020 WL 1501981 (S.D. Fla. Mar. 26, 2020); *Beckel v. Fagron Holding USA, LLC*, 2017 WL 3730395 (M.D. Fla. June 30, 2017); and *Martin v. Creative*

In *Cooper v. Meridian Yachts, Ltd.*, the Eleventh Circuit stated that "[i]n determining whether a choice of law clause contained in a contract between two parties also governs tort claims between those parties, a court must first examine the scope of the provision." 575 F.3d 1151, 1162 (11th Cir. 2009) (citing *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300–01 (11th Cir. 2003)). The court distinguished "broad provisions such as those that refer 'to any and all claims or disputes arising out of' an agreement" from more narrow provisions like the one included in the mortgage here:

> For example, a provision providing that "[t]his release shall be governed and construed in accordance with the laws of the State of [X]," will be construed narrowly as it only purports to govern the agreement itself and does not refer "to any and all claims or disputes arising out of the" agreement.

*Id.* Similarly, in *De Leon v. Bank of Am., N.A. (USA)*, No. 6:09-cv-1251-ORL-28KRS, 2009 WL 3822392, at *4 (M.D. Fla. Nov. 16, 2009), the court held that an Arizona choice of law provision contained in a credit card agreement did not control the plaintiff's FDUTPA claim. Like the choice of law provision in the mortgage here, the choice of law provision in that case stated: "THIS AGREEMENT IS GOVERNED BY APPLICABLE ARIZONA AND FEDERAL LAW." The district court, citing *Cooper*, noted that the choice of law provision in the agreement was to be "construed narrowly as, by its own terms, it only governs the Agreement itself and does not refer 'to any and all claims or disputes arising out of the' Agreement such as a claim for deceptive and unfair trade practices as alleged in Count III." *DeLeon*, 2009 WL 3822392 at *4 (some internal quotation marks omitted). Thus, the narrow choice of law provision in the mortgage is not controlling as to Plaintiffs' FDUTPA claim.

---

*Mgmt. Grp., Inc.*, 2013 WL 12061809 (S.D. Fla. July 26, 2013), *see* Doc. 53 at 16—are inapposite, because unlike FDUTPA, the state law statutory claims in those cases did not sound in tort.

Absent a controlling choice of law provision, federal courts sitting in diversity apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496. With respect to tort claims, Florida courts[7] apply "the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws § 145." *Trumpet Vine Invs., N.V. v. Union Capital Partners, I, Inc.*, 92 F.3d 1110,1115–16 (11th Cir. 1996); *Motmanco, Inc.*, 2005 WL 102726 at *5. The test involves consideration of four relevant factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016).

PHH understandably hopes that Oklahoma law applies to Plaintiff's unfair and deceptive trade practices claim because, as it acknowledges in its motion, Oklahoma's deceptive and unfair trade practices act exempts PHH from its reach, and therefore would allow PHH to evade responsibility for charging the impermissible inspection fees. However, consideration of the relevant factors demonstrates that Florida law should control Plaintiffs' FDUTPA claim. The second and fourth factors—domicile, residence, nationality, place of incorporation and place of business of the parties and the place where the relationship, if any, between the parties is centered—are neutral factors. Although Plaintiffs were domiciled in Oklahoma, Ocwen was a Delaware corporation with its principle place of business in Florida, weighing in favor of neither

---

[7] Although this case is now venued in Oklahoma rather than Florida, it is well settled that after the transfer of a diversity case under Section 1404(a), the transferee court remains obligated to apply the choice-of-law rules of the original forum. *Van Dusen v. Barrack*, 376 U.S. 612 (1964). *See also Doering ex rel. Barrett v. Copper Mountain, Inc.*, 259 F.3d 1202, 1209 (10th Cir. 2001) ("Generally, when a district court transfers a case to another forum, the transferee court must follow the choice of law rules of the transferor court.").

party. *See* Restatement (Second) of Conflict—the General Tort Principle, § 145(2), cmt. e ("Where one of the parties is domiciled or does business in a given state will usually carry little weight."). Similarly, though Plaintiffs' property was located in Oklahoma and that is where they received the invoices charging for the improper inspections, their loan was serviced and their payments processed in Florida. Consequently, neither of these factors weighs in favor of Oklahoma or Florida law.

Turning to the first factor, the place where the injury occurred was undoubtedly Oklahoma, as that is where Plaintiffs owned the property for which the improper inspection fees were charged. PHH suggests that this factor should be determinative, quoting *Cohen v. Implant Innovations, Inc.* that "[t]he state where the injury occurred would, *under most circumstances*, be the decisive consideration in determining the applicable choice of law." 259 F.R.D. 617, 635 (S.D. Fla. 2008) (emphasis added). However, the *Cohen* court went on to note that "the place of injury is less significant in the case of fraudulent misrepresentation than in the case of personal injuries and of injuries to tangible things." *Id.* (internal quotation marks omitted) (quoting Restatement (Second) of Conflict of Laws § 145). *Cohen* thus concluded that "the place of injury is not as significant in the instant case as it would be in a personal injury case and the undersigned will not assign significant weight to the first contact." *Id.* Accordingly, the place of injury, though significant, is not the most important factor in determining which state has the most significant relationship to the unfair and deceptive conduct at issue in this case.

Indeed, the Restatement provides that "when the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance." Restatement (Second) of Conflict—the General Tort Principle, § 145(2), cmt. e. The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those

15

who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* § 501.202(2). A practice is unfair under FDUTPA if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc.*, 842 So. 2d at 777. For this reason, FDUTPA "is designed to protect not only the rights of litigants, but also the rights of the consuming public at large." *Holt v. O'Brien Imports of Fort Myers, Inc.*, 862 So. 2d 87, 89 (Fla. 2d Dist. Ct. App. 2003). Thus, "[a]ny attempt to limit FDUTPA liability is contrary to public policy," because an "individual cannot waive the protection of a statute that is designed to protect both the public and the individual." *Id.* (citations omitted). Consequently, Florida has a significant interest in protecting the public from unfair acts and conduct such as charging mortgagors impermissible and illegal fees.

Where a defendant's deceptive or unfair conduct has occurred or been directed from a centralized location, courts have held that an action "should give greater weight to the Defendants' location as opposed to the place of injury." *Costa v. Kerzner Int'l Resorts, Inc.*, No. 11-60663-CV, 2011 WL 2519244, at *2 (S.D. Fla. June 23, 2011). In *Costa*, the court rejected the defendants' argument that that the plaintiff could not maintain her FDUTPA claim because the most significant relationship with regard to her claim was New York, not Florida. Plaintiff, a resident of New York, prepaid Defendants, two corporations with their principle place of business in Florida, for a stay at a resort in the Bahamas. She alleged that she was injured by paying more for her room than the room was worth because the cost included a "gratuity" charge that was not given to the housekeeping staff despite Defendants' representation that that was the purpose for which it was charged. Plaintiff pre-paid her room charges to the Defendants from New York. The court found that although the plaintiff was domiciled in New York and her injury occurred in New York,

FDUTPA applied to the action because the actual wrongdoing took place at Defendants' headquarters in Florida, where Defendants committed their deceptive and unfair acts. This holding is in line with the Restatement, which provides, "[w]hen the injury occurred in two or more states . . . the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." Restatement (Second) of Conflict—the General Tort Principle, § 145(2), cmt. e

This Court should reach a similar result here, particularly because "FDUTPA applies to non-Florida residents if the offending conduct took place predominantly or entirely in Florida." *Karhu v. Vital Pharma., Inc.*, Case No. 13-60768-CIV, 2013 WL 4047016 (S.D. Fla. Aug. 9, 2013) ("The Court finds that the reasoning in *Millennium* and its progeny provides the fairest reading of FDUTPA's text and stated purpose. Nothing in the language of the statute suggests that it is limited to transactions involving Florida consumers."); *see also Barnext Offshore, Ltd. v. Ferretti Group, USA, Inc.*, Case No. 10-23869-CIV, 2012 WL 1570057, *6 (S.D. Fla. May 2, 2012) ("The Court is unpersuaded that the FDUTPA provides relief only to Florida consumers. . . .[N]othing in *Millennium* suggests that the FDUTPA applies only when conduct occurs entirely within Florida."). While Oklahoma has an interest in this case, it is not greater than the interest Florida has in the application of its laws to deceptive and unfair conduct directed from within its borders.

### 2. The claims at issue in this case fall within the meaning of "trade or commerce" and therefore properly state a FDUTPA claim.

Finally, PHH contends that Plaintiffs' FDUTPA claim should be dismissed because the conduct at issue does not involve "trade or commerce," as required to state a FDUTPA claim. PHH relies on a handful of cases in which courts have stated that servicing and loan collection activity is not trade or commerce.

However, the term "trade or commerce" is defined as "the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8). By virtue of this definition, PHH's conduct falls within the definition of "trade or commerce," as PHH was "providing" inspection "services," though it was doing so impermissibly in violation of HUD regulations. *See Martorella v. Deutsche Bank Nat. Trust Co.*, 931 F. Supp. 2d 1218, 1223-24 (S.D. Fla. 2013) (rejecting defendant's argument that "mortgage loan servicing" did not fall within the definition of "trade or commerce" in holding that a lender's charging of excessive premiums for the force-placement of insurance "falls squarely within the statute's broad definition of trade or commerce").

In *Alhassid v. Bank of America*, 60 F. Supp. 3d 1302 (S.D. Fla. 2014), the court rejected the same argument PHH makes here. In that case, mortgagors brought a putative class action against the mortgagee and the mortgagee's assignee, alleging that they imposed inflated, unauthorized, and improper fees in connection with mortgage loans the defendants owned and/or serviced, first by improperly placing the loans in default and then assessing excessive fees designed to obtain windfall profits at the borrowers' expense. While the mortgagors' claims against the mortgagee were barred due to a prior settlement, their claims against the assignee were not, and the assignee—relying upon the same cases as PHH—argued that the mortgagors' FDUTPA claim was subject to dismissal because "neither loan servicing or debt collection qualify as 'trade or commerce' under FDUTPA." *Id.* at 1323. The court noted the split in authority as to this issue, but explained why that split in authority was irrelevant to the mortgagors' allegations:

> Generally, Nationstar stood in relation to Plaintiffs as a loan servicer in pursuit of its legal debt collection remedies. If all the SAC alleged were loan collection activities, even if those activities were improper, FDUTPA would not apply. *See*

> *State, Office of Att'y Gen. v. Shapiro & Fishman, LLP*, 59 So. 3d 353 (Fla. 4th DCA 2011) (holding that allegations of fabricating false documents or presenting false or misleading documents for use in foreclosures cases were not "trade or commerce" in the FDUTPA context). However, Plaintiffs specifically allege, first, that Nationstar assessed and sought to collect fees outside the scope of its legal entitlement, and more importantly, billed Plaintiffs for specific services which were unauthorized and which Nationstar never performed. For example, Plaintiffs claim that Nationstar charged Alhassid for "property preservation," "property inspections," and "property appraisals," and charged Drennan for "property inspection." SAC ¶¶ 44, 56. *While appurtenant to the pursuit of Nationstar's mortgage servicing rights, those activities can be construed as the separate offer or provision of services within the meaning of FDUTPA.* Like the force-placed insurance policy and premium assessed by the defendant in *Martorella*, certain of the unauthorized activities complained of by Plaintiffs here come within the scope of FDUTPA. Plaintiffs' FDUTPA claim therefore survives Nationstar's Motion to Dismiss.

*Id.* at 1323-24 (emphasis added). The reasoning of *Alhassid* is equally applicable to this case. A practice is unfair under the FDUTPA if it "offends established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *PNR, Inc.*, 842 So. 2d at 777. The Florida Legislature expressed its intent that the provisions of FDUTPA be "construed liberally to promote" various policies including the protection of the "consuming public . . . from those who engage in . . . unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). PHH's conduct in charging Plaintiffs inspection fees in violation of HUD regulations and the terms of the mortgage offended public policy and was unethical, oppressive, unscrupulous and injurious to consumers. FDUTPA was intended to reach exactly this kind of conduct and the fact that this conduct was incidental to the servicing of Plaintiffs' loan should not inoculate PHH from liability for its actions.

**III. CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss in its entirety.

Dated: July 6, 2020

*/s/ John A. Yanchunis*
John A. Yanchunis
Florida Bar No.: 324681
Patrick A. Barthle II
Florida Bar No.: 0099286
**Morgan & Morgan Complex Litigation Group**
One Tampa City Center
201 North Franklin Street, 7th Floor
Tampa, FL 33602
Telephone: (813) 223-5505
Facsimile: (813) 222-2496
jyanchunis@ForThePeople.com
pbarthle@ForThePeople.com

Bradford D. Barron, OBA #17571
**The Barron Law Firm, PLLC**
PO Box 369
Claremore, OK 74017
(918) 341-8402 phone
(918) 515-4691 fax
bbarron@barronlawfirmok.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this July 6, 2020 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all counsel of record.

*s/ John A. Yanchunis*