# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DEWAYNE MATHEWS and** <br> **DEBRA TURNER,** <br><br> Plaintiffs, <br><br> v. <br><br> **PHH MORTGAGE CORPORATION,** <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) No. 4:20-cv-00200-JFH-JFJ <br> ) <br> ) <br> ) <br> ) <br> ) |

### DEFENDANT PHH MORTGAGE CORPORATION'S REPLY IN SUPPORT OF AMENDED MOTION TO DISMISS PLAINTIFFS' COMPLAINT

*/s/ Dale A. Evans Jr.*
P. Russell Perdew – *pro hac vice*
**LOCKE LORD LLP**
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-1712
rperdew@lockelord.com

Dale A. Evans Jr. – *pro hac vice*
**LOCKE LORD LLP**
777 South Flagler Drive
East Tower Suite 215
West Palm Beach, FL 33401
Telephone: 561-820-0248
dale.evans@lockelord.com

Lysbeth L. George, OK 30562
Law Office of Liz George, PLLC
P.O. Box 1375
1019 North Council Road, Suite 3
Blanchard, Oklahoma 73010
Telephone: 405-689-5502
liz@georgelawok.com
*Attorneys for Defendant PHH Mortgage Corporation*

As their Response confirms, Plaintiffs have not alleged facts showing a violation of the applicable HUD requirements. For starters, their discussion of the HUD requirements is confusing; Plaintiffs cite at least *three* different standards for determining whether inspections are appropriate. Only one of those standards is correct: servicers can conduct monthly occupancy inspections where the borrower remains in default and the servicer's efforts to contact the borrower by phone or mail that month have been unsuccessful. Plaintiffs have alleged no facts showing that PHH either failed to make efforts to contact Plaintiffs by phone or mail or that PHH made contact and nonetheless inspected that same month. The Court should dismiss the case in its entirety for that reason alone.

The Court should also dismiss Plaintiffs' FDUTPA claim because Florida law doesn't apply. Plaintiffs' FDUTPA claim is undisputedly based on an alleged violation of HUD requirements that are actionable *only* because the requirements are incorporated into Plaintiffs' contract. Thus, the FDUTPA claim depends on the contract and is subject to the contractual choice-of-law provision. Further, Oklahoma law applies under the "most significant relationship" test. Indeed, notwithstanding these Oklahoma Plaintiffs' professed concerns about Florida's interests, the Florida court transferred this case because "Oklahoma plainly has the strongest connection to this case." The undisputed facts—Plaintiffs are Oklahoma residents challenging inspections on their Oklahoma property under a mortgage negotiated, signed, and performed in Oklahoma and controlled by Oklahoma law—show that Oklahoma has the most significant relationship to this case. Indeed, Plaintiffs properly filed their lawsuit in Oklahoma before forum-shopping in Florida, so Plaintiffs' suggestion that *PHH* is trying to "evade" applicable law is curious.

Finally, the Court should also dismiss the FDUTPA claim because the statute applies only to "trade or commerce", which does not include property inspections conducted by a loan servicer for the sole purpose of protecting HUD's interest in the property.

1

For all of these reasons, PHH asks the Court to dismiss this case with prejudice.

## I.     ARGUMENT

### A.     Plaintiffs misstate HUD requirements.

Respectfully, the Court should be skeptical of Plaintiffs' argument regarding HUD's property-inspection requirements because Plaintiffs can't even say what those requirements are. Plaintiffs assert *three* different standards at three different places in their response:

1. "[P]roperty inspection fees cannot be charged if the home is occupied … ." Resp., p. 3; *Id.*, p. 6 (inspection fees are unrecoverable "for an occupied property").

2. HUD regulation "permits a lender to charge a property inspection fee only if it has reason to believe the home is unoccupied … .". *Id.*, p. 4; *Id.*, p. 7 (same); *Id.* (fees are not permitted "if the lender has no evidence the home is unoccupied").

3. HUD permits "occupancy" inspections "to assist in establishing if a property … has become vacant or abandoned". *Id.*, p. 5. Such occupancy inspections are permitted monthly where the servicer makes ongoing and documented attempts to contact the borrower by phone or mail but has been unable to do so. Resp., pp. 5–7, *citing* ECF No. 53-6, HUD Handbook, ¶¶ 9-9(A)(1)(b)(1), (b)(2), (b)(4), (b)(7), 9-9(A)(2)(d).

Plaintiffs' third description of HUD requirements is correct. The HUD Handbook permits monthly "occupancy" inspections to confirm occupancy where a servicer tries but fails to confirm occupancy by phone or mail. The opening section of the Handbook describes the three different types of inspections and the purpose of an occupancy inspection:

> [I]nspections shall be identified as initial, occupancy and vacant. … The occupancy inspection is necessary to determine when foreclosure action must be initiated and protection and preservation action must be taken if the mortgagee cannot determine the occupancy status by telephone, letter, or other means.

ECF No. 53-6, HUD Handbook, p. 20, ¶ 9-9(A)(1). The occupancy inspection "assist[s] in establishing if a property … has become vacant or abandoned." *Id.*, p. 22, ¶ 9-9(A)(1)(b). Occupancy inspections are required every 30 days after an initial inspection where the borrower "remains in default after the initial inspection and the mortgagee is unable to determine the

occupancy status by telephone [or] correspondence." *Id.*, ¶ 9-9(A)(1)(b)(1).[1] Before inspecting, servicers must try contacting the borrower by phone or mail at least once and must document the attempted contact. *Id.*, pp. 22-23, ¶ 9-9(A)(1)(b)(4); p. 24, ¶ 9-9(A)(2)(b).

Plaintiffs' first two, incorrect, statements of the HUD requirements are not supported by the HUD regulations. Plaintiffs cite 24 C.F.R. § 203.377 to say inspections are permitted only for vacant property, but that regulation merely describes two of the three permissible property inspections: vacant inspections where the servicer learns the property "is vacant or abandoned", and an initial inspection where the borrower is in default "and efforts to reach the mortgagor by telephone within that period have been unsuccessful …." 24 C.F.R. § 203.377. The regulation never says those are the *only* permissible inspections, and Plaintiffs themselves acknowledge that HUD also permits "occupancy" inspections. Plaintiffs also cite ¶ 9-9(A)(2)(d)—which plaintiffs incorrectly call ¶ 9-9(A)(c)(2)(d)—for the proposition that lenders cannot charge for inspections where the property is occupied, but that paragraph merely prohibits charging for inspections where the servicer *knew* the property was occupied through documented communication. HUD Handbook, p. 24, ¶ 9-9(A)(2)(d) (charges are inappropriate where "the mortgagee knew the mortgagor was still in occupancy, such as documented communication … ."). Thus, these provisions do not support Plaintiffs' interpretation of the HUD requirements.

---

[1] The HUD Handbook appears to have a typo in ¶ 9-9(A)(1)(b)(1) because a portion of the sentence (*i.e.*, "… unable to determine the occupancy status by telephone a correspondence on inspection and adequate follow-up …") is incoherent. ECF No. 53-6, HUD Handbook, p. 22. But a separate HUD Handbook that also discusses property inspections contains a clearer expression of HUD's requirements for occupancy inspections. Ex. 1 hereto, HUD Handbook 4330.4, p. 25, ¶ 2-11(B)(1)(b) ("Occupancy. If the mortgage remains in default and the inspector cannot verify that the property is vacant, the mortgagee must perform at least one follow-up to determine whether the property remains occupied. This follow-up must be documented whether it was by letter, telephone or means other than on-site inspection. When the mortgagee is unable to determine the occupancy status by telephone or correspondence, an inspection and adequate follow-up must be made within 30 days of the last inspection or follow-up.").

Plaintiffs also cite HUD Mortgagee Letter ("ML") 81-26. Resp., pp. 6–7. But that letter is 39 years old and has since been superseded by more recent Letters and by the current edition of the HUD Handbook. Specifically, while ML 81-26 only describes vacant and initial property inspections, HUD Mortgagee Letter 2010-18 also specifically authorizes "occupancy" inspections and references the HUD Handbook, Chapter 9-9, for "complete details on inspection requirements and types of inspections." Ex. 2 hereto, HUD ML 2010-18, p. 7, ¶ 6.A. Further, when the current version of the HUD Handbook was released in 1994, HUD's Transmittal Letter specifically noted that ¶ 9-9(A)(1)(b) was being added to "provide mortgagees with specific instructions regarding an occupancy inspection when a mortgage is in default." Ex. 3 hereto, Transmittal Letter, p. 3. Thus, ML 81-26 has been superseded by more recent guidance, which the Court should rely on.

**B.    Plaintiffs plead no facts showing a violation of the actual HUD requirements.**

Under the controlling HUD requirements, Plaintiffs have not alleged facts showing PHH charged for improper inspections, namely that PHH conducted the inspections: (1) without first attempting to contact Plaintiffs by phone or by mail; or, (2) in any month PHH was able to confirm Plaintiffs occupied the property by phone or by mail. The closest Plaintiffs come is that PHH sent mail (including certified mail) to Plaintiffs at the property, and was otherwise in "constant contact" with Plaintiffs, while it was conducting inspections. Resp., p. 8. Neither allegation states a claim.

Plaintiffs' identification of mail that PHH sent to Plaintiffs does not show PHH violated any HUD requirements. PHH showed in its motion—and Plaintiffs do not dispute—that the loan contract required PHH to send Plaintiffs mail at the property address unless Plaintiffs provide a separate address. ECF No. 1-2, p. 26, ¶ 13. While Plaintiffs claim they requested a payoff statement after a foreclosure petition was filed (Resp., pp. 4, 8), Plaintiffs never say—or allege in the Complaint—that their request for a payoff statement (or any other communication) informed PHH

4

that Plaintiffs occupied the property and that PHH still charged them for an inspection that same month. Similarly, Plaintiffs allegation that PHH was "in constant contact" with them is too vague to support a claim. Plaintiffs do not identify a single phone call or letter comprising this alleged "constant contact", including when the communication took place or what was said in the communication. Plaintiffs have thus made no showing that PHH violated HUD requirements.

Plaintiffs' failure to identify **any** communications reflecting a violation of HUD requirements make this case analogous to, and controlled by, *Burnett v. Mortgage Elec. Registration Sys., Inc.*, where the court affirmed the dismissal of a claim alleging defendant sent false communications without identifying a single such communication. 706 F.3d 1231, 1240 (10th Cir. 2013). Plaintiffs try to distinguish *Burnett* by claiming the court's holding was based on the *Burnett* plaintiffs' failure to distinguish among multiple defendants. Resp., pp. 9-10. But *Burnett* made clear that the lack of sufficient factual allegations was an independent basis for dismissal:

> Ms. Burnett's complaint **is not just** deficient because it attributes actions to a large group of collective "defendants," … **but also because** it is a litany of diverse and vague alleged acts ("emails, faxes, correspondence, and/or meetings, and the like") with zero details or concrete examples.

*Id.* (emphasis added). Thus, both this case and *Burnett* involved claims that depended on the details of communications between the parties. Just as the 10th Circuit in *Burnett* affirmed dismissal based on the plaintiff's failure to include any "details or concrete examples" of communications that supported her claim, this Court should also dismiss based on Plaintiffs' failure to do the same here.

Plaintiffs assert PHH's motion seeks to impose an elevated pleading standard. Resp., pp. 8-9. Not at all. Indeed, *Burnett* specifically held that requiring some "details or concrete examples" about the critical communications was "not unfair to [plaintiff]" because plaintiff had been involved in those communications. *Burnett*, 706 F.3d at 1240. PHH's motion seeks the same, and merely what the Supreme Court requires, *i.e.*, "factual content that allows the court to draw the

5

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1940 (2009). Here, Plaintiffs provide no such factual content, so the Court should dismiss the complaint under Fed. R. Civ. P. 8(a)(2).

### C. FDUTPA does not apply because Oklahoma law controls this dispute.

#### 1. The choice-of-law provision applies.

Plaintiffs do not dispute that their FDUTPA claim is dependent upon their contract claim. Both claims rely on alleged violations of HUD regulations, but the alleged violations are actionable only because the loan contract incorporates the regulations. *See Bates v. JPMorgan Chase Bank, N.A.*, 768 F.3d 1126, 1130 (11th Cir. 2014) ("there is no express or implied statutory private right of action for HUD violations"); *Hucke v. Kubra Data Transfer Ltd., Corp.*, 160 F. Supp. 3d 1320, 1327-28 (S.D. Fla. 2015) (violation of Florida statute with no private right of action does not support FDUTPA claim). But despite relying on the contractual provision incorporating HUD regulations, Plaintiffs wish to disclaim the contractual choice-of-law provision that compels application of Oklahoma law. Obviously, Plaintiffs cannot have it both ways; the FDUTPA claim requires the contract and is therefore subject to all contractual provisions.

Plaintiffs cite cases holding a choice-of-law provision does not typically govern purported tort claims. Resp., p. 12. But none of those cases involve a FDUTPA claim that, like this one, is viable only because the contract incorporates a key statute or regulation. *See, e.g., You Fit, Inc. v. Core Indus., Inc.*, 2012 WL 12952734, at *4 (M.D. Fla. June 22, 2012) (FDUTPA claim based on sale of defective equipment); *De Leon v. Bank of America, N.A.*, 2009 WL 3822392, at *4 (M.D. Fla. Nov. 2009) (FDUTPA claim based on failure to timely credit payment); *Motmanco, Inc. v. McDonald's Corp.*, 2005 WL 1027261, at *3 (M.D. Fla. 2005) (negligent misrepresentation and concealment). The claims in those cases did not depend on the contract like Plaintiffs' claim does.

6

The most analogous case was cited in PHH's motion: *Arndt v. Twenty-One Eighty-Five, LLC*, 2020 WL 1501981 (S.D. Fla. Mar. 26, 2020). *Arndt* involved virtually the same contractual choice-of-law provision as here; it stated "This Note is governed by federal law and, to the extent not preempted thereby, by the law of the State of Illinois." *Arndt*, 2020 WL 1501981, * 4.[2] *Arndt* dismissed a Florida statutory claim (under the FCCPA) because the allegations—regarding defendants' repossession of collateral—"directly relate to Defendants' obligations, duties, and performance under the [contract]", so the claim was subject to the contractual choice-of-law provision. *Id.*, at * 5. And contrary to Plaintiffs' assertion (Resp., p. 12, n. 6), FCCPA claims are considered torts just like FDUTPA claims. *U.S. v. Gordon*, 2010 WL 2643531, at *2 (M.D. Fla. June 30, 2010) ("Gordon's FCCPA claim sounds in tort."); (citing *Collection Bureau of Orlando, Inc. v. Continental Cas. Co.*, 342 So. 2d 1019, 1020 (Fla. 4th DCA 1977) (FCCPA claim "fall[s] within broad tort classification of invasion of privacy."). Thus, Florida courts apply contractual choice-of-law provisions to statutory claims that sound in tort where they relate to the contract. The FDUTPA claim here is dependent on the contract, so the choice-of-law provision applies.

### 2. Oklahoma has the most significant relationship to this case.

The parties agree that, if the choice-of-law provision does not control, the four-factor "most significant relationship" test applies and considers: (1) where the injury occurred; (2) where the conduct occurred; (3) where the parties reside or are incorporated; and, (4) where the relationship is centered. Resp., p. 14. Those factors favor Oklahoma law.

**Relationship of the Parties: Oklahoma.** Plaintiffs make the implausible claim that factor four—the place where the parties' relationship is centered—is neutral. The parties' relationship

---

[2] Here, the provision states, "This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located." ECF No. 53-1, p. 12, ¶ 14.

7

centers on a loan that was: (1) negotiated and signed in Oklahoma; (2) disbursed into Oklahoma; (3) secured by, and used to finance Plaintiffs' ownership of, Oklahoma property; (4) memorialized in a contract governed by Oklahoma law and titled "FHA Oklahoma mortgage" (ECF No. 53-1, p. 8); (5) repaid from Oklahoma; and, (6) because PHH could not have foreclosed in a Florida court, subject to enforcement exclusively in Oklahoma courts. Plaintiffs' response that PHH's predecessor Ocwen was headquartered in Florida not only double (or even triple) counts the significance of that single fact—Plaintiffs' also rely on Ocwen's Florida headquarters for factors two and three—but that single fact is hardly the equivalent of all the Oklahoma connections so as to render the locus of the parties' relationship "neutral." The parties' relationship remains overwhelmingly focused in Oklahoma, as the Florida court found when it transferred the case to Oklahoma. ECF No. 30, p. 6 ("the locus of operative facts is Oklahoma"), and as Plaintiffs recognized when they filed this lawsuit in Oklahoma prior to forum-shopping in Florida.

**Parties' Residence: Oklahoma/Neutral.** Plaintiffs assert that factor three—the parties' residence—is a neutral factor because Plaintiffs are in Oklahoma and PHH's predecessor Ocwen was in Florida. ECF No. 56, p. 14-15. But Plaintiffs ignore that: (1) Ocwen's relevant business was servicing loans in Oklahoma; and, (2) PHH is neither incorporated nor headquartered in Florida. Thus, this factor leans in favor of Oklahoma, and Plaintiffs concede it is, at most, neutral.

**Location of Injury (Oklahoma) and Location of Conduct: Oklahoma/Neutral.** Plaintiffs acknowledge factor one—location of injury—favors Oklahoma (Resp., p. 15) but assert factor two—location of conduct—favors Florida and that factor two is more important. But factor two favors Oklahoma because the most relevant conduct occurred in Oklahoma, including the inspections, Plaintiffs' occupancy, and the communications that allegedly informed PHH of Plaintiffs' occupancy. The Florida court recognized as much in its transfer order, where it

8

discounted the significance of alleged conduct in Ocwen's Florida headquarters because the alleged formulation of policies in Florida was less relevant than the implementation of the policies in Oklahoma. ECF No. 30, p. 6. Indeed, one of Plaintiffs' own cases, *Cohen v. Implant Innovations*, found factor two neutral where a defendant created misleading marketing materials in Florida and plaintiff received the materials in Missouri because "the conduct causing the injury occurred in both Florida and Missouri." 259 F.R.D. 617, 635-36 (S.D. Fla. 2008). Thus, even under the most charitable construction of Plaintiffs' allegations, factor two is neutral.

Plaintiffs' reliance on *Costa v. Kerzner Intern. Resorts*, 2011 WL 2519244 (S.D. Fla. June 23, 2011) to argue location of conduct is more important than location of injury is unavailing. *Costa* is different because the parties' relationship there was focused on a third location (a resort in the Bahamas) rather than (as here) on the plaintiff's home state. This distinction is critical because, as Plaintiffs admit, *Costa*'s holding "is in line with the Restatement", which only discounts the place of injury "when the place of injury can be said to be fortuitous … ." Resp., p. 17, *quoting* Restatement (Second) of Conflict—the General Tort Principle, § 145(2), cmt. e. Here, the place of injury—where Plaintiffs live—is ***not*** fortuitous.

Plaintiffs cite cases holding that FDUTPA ***can*** apply to claims of non-Floridians (Resp., p. 17), but those cases do not hold that FDUTPA claims escape application of the controlling "most significant relationship" test. Plaintiffs also accuse PHH of trying to "evade responsibility" through application of Oklahoma law. Resp., p. 14. But Oklahoma law permits a potential contract claim (subject to the arguments above). Indeed, Plaintiffs originally asserted their claim in an Oklahoma court. Plaintiffs dismissed and refiled in Florida (adding a FDUTPA claim for the first time) when the prior Oklahoma case went poorly for them. Plaintiffs should not accuse PHH of trying to "evade responsibility" when the Florida court rejected Plaintiffs' attempted change of forum.

9

All factors favor Oklahoma; at most, factors two and three are neutral. Thus, Oklahoma law applies, and the Court should dismiss the FDUTPA claim.

### 3. Inspections are not trade or commerce under FDUTPA.

Plaintiffs cite *Martorella v. Deutsche Bank Nat. Trust Co.,* 931 F. Supp. 2d 1218, (S.D. Fla. 2013) and *Alhassid v. Bank of America,* 60 F. Supp. 3d 1302 (S.D. Fla. 2014) for the claim that "providing inspection services" is trade or commerce under FDUTPA. Resp., pp. 18-19. But the same Florida court later distinguished those cases. In *Cornette v. I.C. System, Inc.*, the court dismissed a FDUTPA claim against a debt collector for an allegedly unauthorized fee because the fee was not trade or commerce under FDUTPA, finding that *Martorella* and *Alhassid* did not apply because those cases involved fees that were either excessive or for services that were never performed, whereas the plaintiff in *Cornette* sued for allegedly unauthorized fees. 280 F. Supp. 3d 1362, 1365 (S.D. Fla. 2017) ("Plaintiff here has only alleged that Defendants attempted to collect a charge that was not expressly authorized by the contract, not that the charge was excessive or that Defendant charged Plaintiff for a service that was not performed."). Like *Cornette*, Plaintiffs here alleged PHH charged unauthorized fees but do not allege they were excessive or for services that were not performed. Thus, *Martorella* and *Alhassid* do not apply.

PHH did not sell the property inspections at issue here to Plaintiffs but rather conducted them for the benefit of the FHA (which insured the loan) as part of PHH's duty to properly service the loan. The inspections are not "trade or commerce", and this mandates dismissal of the claim. *Benjamin v. CitiMortgage, Inc.*, 2013 WL 1891284, at *4-5 (S.D. Fla. May 6, 2013) (dismissing FDUTPA claim "[b]ecause the defendants' servicing of the mortgage did not fall within the purview of trade or commerce").

For these reasons, PHH asks the Court to dismiss Plaintiffs' complaint in its entirety.

Dated: July 20, 2020                    Respectfully submitted,

*/s/ Dale A. Evans Jr.*
P. Russell Perdew – *pro hac vice*
**LOCKE LORD LLP**
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 443-1712
rperdew@lockelord.com

Dale A. Evans Jr. – *pro hac vice*
**LOCKE LORD LLP**
777 South Flagler Drive
East Tower Suite 215
West Palm Beach, FL 33401
Telephone: 561-820-0248
dale.evans@lockelord.com

Lysbeth L. George, OK 30562
Law Office of Liz George, PLLC
P.O. Box 1375
1019 North Council Road, Suite 3
Blanchard, Oklahoma 73010
Telephone: 405-689-5502
liz@georgelawok.com

*Attorneys for Defendant PHH Mortgage Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2020, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants: Bradford D. Barron, John A. Yanchunis, and Patrick A. Barthle II, Counsel for plaintiffs Dewayne Mathews and Debra Turner.

                                                /s/ *Dale A. Evans Jr.*
                                                Dale A. Evans Jr.

12

83178626